*Special Situations Fund III QP, L.P., et al., v. Travel Centers of America Inc., et al.*, No. 678, September Term, 2024.  Opinion by Nazarian, J.

**BUSINESS JUDGMENT RULE**

Under the business judgment rule, a reviewing court presumes that the board of directors acted in good faith and in the best interests of the corporation. Md. Code (1975, 2014 Repl. Vol., Supp. 2024), § 2-405.1(g) of the Corporations & Associations Article. To overcome the business judgment presumption, a claimant must plead facts that demonstrate fraud, bad faith, unconscionable conduct, or a conflict of interest relating to the board of directors' decision.

**BUSINESS JUDGMENT RULE – CONFLICTS OF INTEREST – STOCKHOLDER RATIFICATION**

Stockholder ratification can cure an alleged breach of fiduciary duty by a board of directors where there has been a full disclosure of the potential conflict to the ratifying stockholders.

**MOTION TO DISMISS – MATTERS OUTSIDE THE PLEADINGS – EXCULPATION CLAUSE**

The circuit court's consideration of an exculpation clause did not convert a motion to dismiss into a motion for summary judgment where complaint alleged that directors had breached their fiduciary duties, in part, by failing to provide all material information about merger in their proxy statement to stockholders, and where proxy statement incorporated the annual report by reference.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 678

September Term, 2024

_____

SPECIAL SITUATIONS FUND III QP, L.P.,
ET AL.

v.

TRAVEL CENTERS OF AMERICA INC., ET
AL.

_____

Berger,
Nazarian,
Sharer, J. Frederick,
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: November 25, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

BP Products North America Inc. ("BP") entered into an agreement to acquire Travel Centers of America Inc. (the "Company"). ARKO Corp. ("ARKO"), a competitor, also sought to buy the Company and forwarded a bid after BP and the Company had agreed to merge but before the Company's stockholders had voted to approve the merger. The Company's board of directors (the "Directors") concluded that ARKO's offer was not superior to BP's and could not reasonably be expected to lead to a superior proposal. The Directors rejected ARKO's proposal and the stockholders approved the transaction.

Southeastern Pennsylvania Transportation Authority ("SEPTA") and Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., and Special Situations Private Equity Fund, L.P. (collectively "SSF") each filed complaints arising from the merger. SEPTA alleged that the Directors had breached their fiduciary duties by agreeing to proceed with the merger rather than accepting ARKO's offer. SSF alleged that the Directors breached their fiduciary duties and that Service Properties Trust ("SVC"), The RMR Group LLC ("RMR"), and BP aided and abetted those Directors in breaching their duties. The cases were consolidated, and on a collective motion to dismiss from the defendants, the Circuit Court for Baltimore City dismissed SSF's complaint. SSF appeals and we affirm.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    *The main players*

The Company is a publicly traded full-service travel center network. It was founded in 1972, incorporated under the laws of Maryland as of 2019, is headquartered in Westlake,

Ohio, and has locations in forty-four states. The Company offers diesel and gasoline fuel, truck maintenance and repair, restaurants, travel stores, and parking services. The Company describes itself as "committed to sustainability," a commitment it says it demonstrates through a specialized business unit for sustainable energy.

The Company has a board of directors: Barry Richards, the Company President; Jonathan M. Pertchik, a Managing Director and Chief Executive Officer ("CEO"); Peter J. Crage, the Executive Vice President, Chief Financial Officer, and Treasurer; Michael J. Barton, the Senior Vice President and Chief Accounting Officer; Adam D. Portnoy, a Managing Director; Barbara D. Gilmore, the lead independent director; Lisa Harris Jones, an independent director; Joseph L. Morea, an independent director; Rajan C. Penkar, an independent director; and Elena B. Poptodorova, an independent director (collectively the "Directors").

The Company is SVC's subsidiary as well as SVC's largest tenant. When SVC bought the Company in 2007, the Company granted SVC a right of first refusal to acquire any interest the Company owns in any travel center before the Company sold or leased that travel center. Also party to this landlord-tenant relationship is RMR, the majority-owned subsidiary of RMR Inc. RMR provides management services to SVC's tenants, including the Company. These services to the Company include regulatory compliance, advice and supervision, site selection for new travel centers, identification and acquisition of Company properties, accounting and financial reporting, capital markets and financing activities, investor relations, and oversight over the Company's day-to-day activities. As a result, the Company is "substantially dependent" on its relationship with SVC and "dependent" on its

arrangements with RMR.

As part of that tripartite relationship, most of the independent directors are board members of other companies to which RMR or its subsidiaries provide management services. Some of the Directors also are involved heavily with SVC and RMR. For example, Mr. Pertchik, in addition to his role as CEO and Managing Director of the Company, serves as the Executive Vice President of RMR. Mr. Portnoy, who is the Company's other Managing Director, is the chairman of SVC's board as well as a managing trustee for SVC. He also serves as the managing trustee, president, and CEO of RMR. Mr. Portnoy holds those latter two roles at RMR Inc., is the controlling stockholder at RMR Inc., and is a director of RMR Inc.

The nature of the parties' relationships before the transaction lies at the heart of this appeal. Before we get to the transaction, two more parties remain. BP is one of the major fuel supply companies in the United States. It is a Maryland corporation with its principal executive offices in Houston, Texas. BP is engaged primarily in transporting, refining, manufacturing, marketing, and distributing gasoline and diesel fuel. ARKO is one of the largest operators of convenience stores and wholesalers of fuel in the United States. It is based in Richmond, Virginia.

### 2. *Early discussions*

On May 13, 2021, Mr. Richards introduced Mr. Pertchik to a BP representative through email. The representative wanted to understand the areas of common interest between BP and the Company. Mr. Pertchik would go on to meet with another BP representative over the phone to discuss the Company's sustainability priorities. The

3

discussions progressed to include another BP representative whom Mr. Pertchik met through email. He then asked Dennis King, the senior vice president of corporate development at the Company, to explore sustainable energy opportunities for both companies.

Mr. King and the BP representative spoke on June 21, 2021 and continued to speak throughout 2021 and early 2022. At no point, however, were there any "discussions regarding a potential acquisition." In August of that same year, one of the Company's subsidiaries entered into a confidentiality agreement with BP about potential commercial relationship opportunities. Then in early 2022, Mr. Pertchik met with other BP representatives to discuss more commercial opportunities, including opportunities with sustainable and alternative energy markets. These discussions included broader initiatives such as a more comprehensive strategic relationship.

The next month, a representative from Party A contacted Mr. Pertchik. On March 29, 2022, Messrs. Pertchik and Portnoy, along with several individuals from Party A, held a phone meeting to discuss a potential strategic relationship. On April 4, 2022, Mr. Pertchik met with another BP representative who suggested that Mr. Pertchik speak with yet another BP representative. That conversation took place over the phone, and the two concluded that the Company and BP should enter into an amended and restated confidentiality agreement before any further discussions. They agreed to meet again on April 21 before entering into the confidentiality agreement.

On that same day, April 4, Mr. Pertchik also spoke on the phone with a Party B representative about a potential strategic relationship. Two days later, a Party C

representative also spoke on the phone with Mr. Pertchik about a potential strategic relationship. And for the remainder of that month and bleeding into early May, Mr. Pertchik continued discussions with representatives from Party A about their potential strategic relationships.

The Directors met on April 7, 2022, to discuss the potential suitors' inquiries. Mr. Portnoy informed the Directors that the Company had received unsolicited inquiries from Parties A, B, and C concerning potential strategic relationships. The Directors then considered each Party and the potential for selling the Company. In doing so, the Directors recognized that SVC would have to approve any such acquisition and that creditworthiness would be crucial to SVC's assent. So the Directors excluded Party C after determining that Party C would not be a credible buyer due to a lack of faith in its ability to pay a sufficient price and in its creditworthiness and liquidity. The Directors directed the Company's management to discontinue conversations with Party C.

On April 21, the Company and BP met over the phone. The parties discussed various commercial opportunities, a possible partnership, and capital investment that would allow BP to participate in the Company's expansion into sustainable and alternative energy. The companies also entered into a confidentiality agreement with a standstill provision.[1] On May 3, 2022, BP requested in writing certain non-public information from the Company, which the Company provided on May 22, 2022. Between those two dates, on May 11, the

---

[1] In general, a standstill provision is an agreement to refrain from taking further action. *See Standstill Agreement*, *Black's Law Dictionary* (12th ed. 2024)

5

parties met again to discuss additional strategic opportunities.

The Directors held a meeting on June 9, 2022. Mr. Pertchik updated the Board on the conversations with BP and Party A. He revealed that BP was evaluating the Company as a potential acquisition target, whereas Party A was more focused on a potential fuel distribution arrangement. He and Mr. Portnoy reviewed the Company's current and projected performance and answered the Directors' questions. The Directors concluded at that meeting that the management should continue engaging with BP and permit BP to evaluate the Company. They also concluded that the Company was not interested in a fuel distribution arrangement at that time, but that the Company should continue discussions with Party A. The next day, the Company entered into a confidentiality agreement with Party A.

On June 16, 2022, at a meeting between BP's and the Company's representatives to discuss additional strategic transactions, BP indicated its interest in acquiring the Company. From there until around October 2022, the Company and BP met from time to time and discussed the potential transaction. On June 17, 2022, Mr. Pertchik met with Party A's representatives over the phone. During that conversation, Party A expressed an interest in broader strategic relationships and potentially acquiring the Company. However, they informed the Company that Party A's primary focus was expanding its fuel distribution, especially diesel fuel. Mr. Pertchik felt that such an arrangement likely would not be advantageous to the Company.

On June 28, 2022, Messrs. Pertchik and Portnoy discussed whether SVC would consider amending its leases to accommodate BP. Four days later, BP asked once more in

writing for non-public information from the Company, which the Company provided throughout July and September 2022. On July 20, the Company and BP added SVC and RMR to their confidentiality agreement, which included a standstill provision. Five days later, BP's representatives met with the Company's representatives again, this time with SVC and RMR representatives present. BP expressed an interest in purchasing the Company. It also inquired about SVC's leases and whether SVC would be willing to sell some or all of its leased properties to BP, along with the trademarks and trade names that SVC owned. BP also informed the Company and SVC about its general business priorities related to amending the SVC leases. Finally, BP inquired about the management arrangement between the Company and RMR.

On September 19, 2022, at a board meeting, Mr. Portnoy informed the Directors that the Company had continued to engage with BP to facilitate BP's evaluation of a potential transaction. He did not believe, however, that an offer was forthcoming at that time. Mr. Pertchik chimed in and informed the Directors that there had been no substantive discussions with Party A since June. The two managing directors then answered the Directors' questions. The Directors concluded that the Company should engage a financial advisor to assist the Company in evaluating a potential sale, pursuing such a sale, and advising the Directors. Based on familiarity with the Company, its industries, and expertise in these types of transactions, the Directors directed the Company's management to engage Citigroup ("Citi") as its financial advisor. The Directors also hired Ropes & Gray LLP ("R&G") as its legal advisor for the transaction.

The Company's management directed Citi to contact only potential suitors who met

7

SVC's approved financial profile, given that SVC was unlikely to consent to suitors that required significant financing because SVC deemed those suitors as high risks to default on their leases. On October 4, 2022, Citi met with the Company's management to discuss the potential sale. For the rest of the month, Citi and the Company prepared a confidential memorandum that contained non-public information about the Company to share with potential bidders in a virtual data room. Messrs. Pertchik and Portnoy held a telephone meeting with BP representatives on October 20, 2022, during which BP expressed its continued interest in a potential transaction. They also discussed the upcoming process, including timing and other details, then agreed to stay in contact. Six days later, Citi apprised the Directors of the upcoming process and that it would begin soon its outreach process to potential suitors.

On October 28, 2022, the Company's management met with Citi and R&G. Mr. Portnoy described the discussions with BP in the time since the last meeting and explained how the management team and Citi had been working to create the confidential memorandum. He also noted that SVC's board of trustees had discussed this sale and indicated that SVC would only consider transferring its leases and guarantees on the condition that it was satisfied with the purchaser's creditworthiness. Mr. Portnoy revealed as well that SVC was not interested in selling any of the Company's real estate at that time but otherwise would consider reasonable amendments to its leases should it find the purchaser's profile satisfactory.

### 3. *The bidding process*

At the same October 28 meeting, Citi explained that there were eleven parties likely to meet the requisite criteria based on their strategic interests and credit and financial profiles. SVC required a buyer with a minimum credit rating of BBB from S&P Global Ratings or Baa2 from Moody's Ratings because it believed those buyers would be more likely to consummate the transaction. SVC would be unlikely, however, to consent to a buyer that required significant financing because such a buyer would be more likely to default on the lease. Citi also described the potential timeline and answered the Directors' questions about the sale process. Finally, the Directors instructed Citi to begin reaching out to the eleven parties beginning on October 31, 2022. The Directors then discussed Citi's engagement letter and ratified the terms of engagement.

During the week of October 31, 2022, Citi contacted the eleven parties and provided draft confidentiality agreements to eight of them. From October 31 to December 13, the Company responded to the potential purchasers' diligence requests, and Citi held meetings with the potential purchasers to answer their questions and gauge their interest in the transaction. On November 3, 2022, the Company granted BP access to the virtual data room to conduct due diligence. This room included non-public documentation of the Company's finances, leases, other contracts, and debt. The other potential purchasers were to be granted access to the same room upon signing their confidentiality agreements. Three of them signed: Parties D, E, and F. The remaining parties declined to sign their confidentiality agreements, and with that, ended their pursuit of the Company.

Because BP was one of the Company's competitors, BP had to enter into a

"supplemental clean team" confidentiality agreement with the Company. This allowed BP entry into a separate virtual room on December 6, 2022, where the Company shared competitively sensitive information with the only BP representatives who did not have responsibility for competitive business decisions for their employer. On December 1, 2022, Party D informed Citi that it would no longer be pursuing the acquisition of the Company. Twelve days later, on December 13, 2022, Party F notified Citi that it too would no longer be pursuing the acquisition of the Company.

That same day, the bids came in. BP offered to purchase 100% of the equity in the Company for $60 per share in cash. BP's proposal also included summarized modifications of the SVC leases and noted an interest in retaining some of the Company's employees, including the management team. Party E offered to purchase 100% of the equity in the Company for $71 per share in cash. Party A followed up two days later, but didn't bid; instead, it informed Citi that it would not pursue the acquisition of the Company.

On December 16, 2022, the Company met with its management team and advisors from Citi and R&G. Citi summarized the two proposals on the table and noted that BP had set forth its proposed amendments to the SVC leases whereas Party E had not. Citi also informed them that the other potential purchasers who had signed confidentiality agreements had elected not to pursue the transaction further. It revealed that it had spoken with BP and informed BP that its offer was not compelling. Mr. Portnoy spoke, revealing more about BP's proposals regarding SVC's leases. He also described how SVC was aware of the bidders' identities and how he planned to preview BP's lease proposals to SVC before the Company responded to the bids. Citi and Mr. Portnoy answered the Directors'

10

questions and the Directors directed the management team and the Company's advisors to continue with the transaction, to provide BP and Party E additional diligence materials, to draft a merger agreement with the respective bidders, and host meetings for BP and Party E.

The next day, Citi informed BP's financial advisor, Goldman Sachs, that BP would move on to the next round of bidding. Given BP's strong balance sheet and creditworthiness—with a rating of A2 from S&P or A from Moody's—the Company viewed BP positively. But that alone didn't distinguish its bid since other bidders shared the same attributes, and the Company viewed BP's bid as well below satisfactory. On December 22, 2022, the Company granted access to an expanded virtual data room to BP and Party E to complete their due diligence. The day after that, the Company allowed Party E's advisors to see the "separate clean room" to which BP had had access, but only those Party E representatives who were not responsible for the competitive business decisions of their employer.

On January 9 and 10, 2023, Citi's representatives reached out to BP and Goldman to inform them of certain bidding instructions. During that conversation, Citi told them that BP's offer would need to increase substantially to acquire the Company and that BP should submit its best offer. R&G then posted a draft merger agreement in the virtual data room for comment and review on January 10, 2023. Citi requested that BP and Party E submit revised drafts of the merger by February 1, 2023 and submit their final bids on or before February 7, 2023. On January 12, 2023, Citi, under SVC's direction, informed the parties in the virtual data room that SVC would consent to the Company's entry into the merger

11

and resulting change of control. Upon closing, the Company and a subsidiary of SVC would amend the leases, restate the Company's guarantees, and SVC would sell its trademarks to the Company.

For the remainder of that month, the Company's management team, along with Citi, gave presentations about the Company's business to BP and Party E separately, participated in diligence sessions, and provided tours of the Company's facilities to BP and Party E. Citi met separately with BP to discuss the Company's financial model, capital expenditure spending, and growth rate assumptions in the Company's business model. Messrs. Pertchik and Portnoy also met with BP, along with a Citi representative, to discuss the potential transaction, the Company's business plans, and BP's strategic plan for the Company. On January 27, 2023, the Directors met, with Citi and R&G in attendance. At that meeting, Mr. Portnoy updated the Directors on the process and the meetings that had occurred with BP's and Party E's senior management. He also revealed that during his and Mr. Pertchik's meeting with BP, BP had reaffirmed its interest in the transaction. Mr. Portnoy expected both parties to submit their proposals by February 7, 2023.

Four days later, Citi and the Company's management team met with BP's management to discuss the Company's liquified natural gas capabilities. The next day, BP and Party E submitted their comments on the draft merger agreement to R&G. BP provided detailed comments on the leases, whereas Party E offered only general commentary. On February 3, 2022, Citi discussed the upcoming bid with Goldman. It informed Goldman that BP would have to bid its best price because there would not be a third round of bidding. Citi also informed Goldman that the Directors intended to proceed with the best offer

expeditiously and finalize the transaction upon receipt of the second round of bids. Two days after that, R&G, under the Company's direction, posted a draft of the Company's disclosure schedules to the virtual data room.

### 4. One prevailing bidder

The final bids came on February 7, 2023. BP and Party E offered $86 per share and $68 per share, respectively, for 100% of the Company's equity. Although neither party provided updated drafts of the merger agreement, BP provided a marked-up version of the merger agreement that included a requirement that the voting agreements of SVC and RMR be delivered at signing. BP also noted in its proposal that its diligence process was substantially complete. Party E, on the other hand, noted that it still had outstanding diligence requests but expected to complete its review within thirty days.

The Directors met the next day. Citi and R&G were in attendance. The attendees discussed the two proposals. R&G provided feedback on the bidders' markup of the merger agreement. R&G noted that although Party E only provided a partial markup, BP's markup was more detailed with several points. The Directors then instructed the Company's management to negotiate the transaction with BP. Citi notified BP on February 9, 2023 that the Company would agree to BP's proposal on the condition that the parties negotiate a satisfactory merger agreement and that BP and SVC agree on the terms. R&G also provided a revised draft merger agreement to BP's and SVC's counsel and sent the revised drafts of the lease documentation to BP's counsel.

From February 11 to February 15, the Company, BP, SVC, and RMR negotiated a merger agreement. These negotiations included each party's financial and legal advisor.

The parties resolved several issues, such as the lease documentation issue. As part of that specific resolution, the parties agreed that the guarantor must have a net worth exceeding $15 billion, a credit rating of at least BBB- from S&P or Baa2 from Moody's, or a credit rating that SVC would otherwise accept. Then, on February 15, 2023, the Directors met again with the Company's management and representatives from Citi, R&G, and Venable LLP, the Company's local counsel in Maryland. R&G reviewed the terms and conditions of the transaction documentation, then Venable informed the Directors of their duties under Maryland corporate law.

At that same meeting, Citi delivered its opinion (orally and memorialized later) about the fairness of the transaction to the Company's stockholders. It opined that the "merger consideration to be received by the holders of [the Company's] common stock is fair, from a financial point of view" to those stockholders. The Directors then reached their unanimous conclusions. They concluded that the terms of the merger were in the Company's and stockholders' best interests; approved the merger, subject to the stockholders' approval; directed the Directors' approval to be submitted to the stockholders to vote; and resolved to include the Directors' recommendation in the proxy statement provided to the stockholders ahead of the vote. The parties then signed the merger agreement ("Merger Agreement").

The Company and BP each issued press releases about the transaction. Citi also informed Party E about the transaction with BP.

*5. ARKO's bid*

On March 14, 2023, ARKO submitted its unsolicited proposal. Its offer was for 100% equity at $92 per share. ARKO planned to finance the transaction through cash, external financing, and lines of credit through Oak Street Real Estate Capital LLC ("Oak Street"). ARKO contemplated a thirty-day timeline to conduct due diligence and sign the requisite documentation. ARKO was also prepared to enter into lease documentation substantially similar to BP's agreement. The proposal included a letter from a potential financing source stating that its agreement was "subject to certain items and conditions, including pricing." Nevertheless, ARKO stated in its offer that its financing was not contingent on consummating the transaction.

The following day, the Company informed BP about ARKO's offer, as required by the Merger Agreement. Two days later, the Directors met to discuss ARKO's proposal. Representatives from Citi, R&G, and Venable were also present. Mr. Portnoy described ARKO's proposal. R&G advised the Directors that under the Merger Agreement, there were restrictions on the Company's ability to discuss ARKO's proposal with ARKO's representatives. R&G also informed the Directors about the various factors it ought to consider when evaluating whether ARKO's offer could constitute or be reasonably expected to constitute a superior offer. Indeed, the Merger Agreement provided that the Company could entertain an unsolicited offer that the Directors deemed superior or that could reasonably be expected to lead to a superior proposal:

> [A]t any time following the date hereof and prior to obtaining the Company Stockholder Approval, if the Company or any of its Acquisition Representatives on the Company's behalf has

received a written, *bona fide*, unsolicited Acquisition Proposal from any Third Party (or a Group of Third Parties) that the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel, constitutes or could reasonably be expected to lead to a Superior Proposal, and the failure to take the following actions would reasonably be expected to be inconsistent with its duties under Applicable Law, then the Company, directly or indirectly through the Acquisition Representatives of the Company may (i) engage in negotiations or discussions with such Third Party and its Acquisition Representatives and (ii) furnish to such Third Party or its Acquisition Representatives non-public information relating to the Company or any of its Subsidiaries pursuant to an Acceptable Confidentiality Agreement[.]

Venable then summarized the Directors' duties under Maryland corporate law. The Directors considered the proposal and its potential impact on the Merger Agreement. Mr. Portnoy and the advisors answered the Directors' questions. The Directors then decided to meet again the following week to discuss ARKO's proposal further. They also asked the Company's management and advisors to gather more information on ARKO.

On March 22, 2023, the attendees from the previous board meeting reconvened. Mr. Portnoy relayed once more the terms and conditions of ARKO's proposal and updated the Directors on the status of the BP transaction. He also informed the Directors that SVC's board of trustees and all its independent trustees had reached a preliminary consensus that, given ARKO's credit rating and financial conditions, SVC would not engage in negotiations with or consent to assigning the Company's leases to ARKO. Venable again informed the Directors of their respective duties under Maryland corporate law.

The independent directors then went into executive session; this meeting didn't include Messrs. Pertchik and Portnoy, the Company's managing directors, other

16

management, or the Company's advisors. The independent directors concluded that ARKO's proposal was not a superior proposal and could not reasonably be expected to lead to one as outlined in the Merger Agreement. These directors provided multiple reasons for their conclusion: ARKO's financing was not firm; ARKO stated that it needed thirty days to complete diligence, time that might jeopardize the BP transaction; although ARKO said it would enter agreements similar to BP subject to conducting diligence, ARKO did not provide draft agreements or proposals for the Directors' consideration; BP's offer provided regulatory certainty where ARKO's did not; and SVC's board had reached its preliminary consensus, effectively rejecting ARKO. The full Board then reconvened and determined unanimously that ARKO's offer was not a superior proposal and could not reasonably be expected to lead to one. The Directors then directed the Company's management to inform ARKO of the Directors' decision, which the Company did by letter.

That same day, the Company filed its preliminary proxy statement for the BP transaction. ARKO responded to the Company's letter on March 27, 2023. It found "surprising" that ARKO's offer was not superior and could not reasonably be expected to lead to one so superior. ARKO also felt excluded from the process, as it was not one of the eleven parties Citi reached out to initially. Nevertheless, ARKO declared that its offer was a nearly 7% premium to BP's offer, reflecting approximately $100 million more. ARKO also stated that it had vast experience with regulatory processes. Finally, ARKO wrote that its credit rating was B+ as rated by Standard and Poor's and B2 as rated by Moody's. ARKO was also prepared to pay more under the lease agreement with SVC, as well as to purchase additional SVC real estate related to this transaction.

17

That same day, ARKO issued a press release disclosing its offer and the Company's response. ARKO also wrote SVC a letter addressing the lease documentation and ARKO's creditworthiness. The Company informed BP of ARKO's March 27 letter. On March 28, 2023, the Company issued a press release confirming that it had received ARKO's offer but concluded that it was not a superior offer and that it could not be reasonably expected to lead to one. The Company stated that there was a high level of execution risk due to ARKO's failure to obtain financing and ARKO's sub-investment grade credit rating, rendering it unfavorable to SVC. The Company highlighted how potential mergers required SVC's consent and that lease document execution was a closing condition for any merger. The Company rejected ARKO's offer.

On March 29, 2023, the Directors received a third letter from ARKO. This letter restated the terms of its offer and informed the Directors that it had amended its existing real estate program to increase its capacity to acquire the Company's properties. ARKO also issued a press release that disclosed the terms of its proposal and the real estate purchase program. The Company informed BP of the letter, as required under the Merger Agreement. On April 3, 2023, the Company issued a press release detailing how ARKO had increased the potential availability of its real estate purchase program but nevertheless had not addressed the primary issues in its offer, specifically ARKO's financing, which remained conditional and uncommitted, and its subpar credit rating. The Directors also stated how they had determined unanimously that ARKO's proposal was not a superior proposal and could not reasonably be expected to lead to one and, as a result, that the Merger Agreement prohibited the Company from engaging with ARKO.

ARKO responded on April 17, 2023. With regard to its creditworthiness, ARKO revealed that it had obtained an insurance provider with an A rating from S&P or A3 from Moody's that was ready to insure its lease payments. ARKO expressed that it was open to offering more cash than $92 per share, but only after it completed due diligence. It also stated that that money would be payable in cash. Additionally, ARKO was prepared to pay the termination fee to BP, to RMR, and for the brand purchase from SVC. Finally, ARKO was prepared to accept substantially the same or even more favorable terms than BP.

After receiving that letter, ARKO and the Company's legal and financial advisors met to discuss ARKO's proposal on April 19, 2023. Five days later, the Directors mailed a letter to ARKO and issued a press release about that meeting. In the letter, the Directors reiterated their conclusion that ARKO's bid was not a superior proposal and could not reasonably be expected to lead to one due to ARKO's lack of committed financing. This financing included what the Directors concluded was an overvaluation of some of properties that ARKO planned to sell as part of its financial package. The Directors also were concerned that ARKO would only own those properties after the transaction, i.e., that ARKO's ability to finance the transaction turned on the sale of properties it would be acquiring in the deal. ARKO had also referenced an extended Capital One line of credit as part of its financial package that it could obtain from an expanded asset-based lending facility, but ARKO didn't provide the Directors with evidence that those funds were available. Additionally, ARKO had not provided the Directors any information about the terms and conditions under which ARKO could draw on those credit facilities, nor had it obtained assurances from lenders that it could draw on them. ARKO also had planned to

19

use some of the cash on hand at the Company, but the Directors were concerned that ARKO would not have access to those funds until the transaction was completed and the Company needed those funds for its ongoing business activities.

With regard to ARKO's credit insurance policy, the Directors noted that during the meeting, ARKO did not identify any details about that policy. ARKO told the Company's advisors that ARKO's discussions with the insurer were preliminary, and ARKO refused to identify the insurer or to permit the Directors' advisors to speak with the insurer. ARKO didn't know how much the insurer's policy would cost, as ARKO had not yet had that discussion with the insurer. The Directors were concerned by ARKO's reluctance to obtain a bridge loan, a typical procedure in a transaction such as this. And finally, the Directors cited an execution risk as another reason to reject ARKO. The Directors stated that the next available offer, should the BP transaction fail, was at $68 per share—a significant drop from BP's $86 per share offer. In addition, back in 2018, ARKO had reduced its initial bid in another transaction concerning the Company's convenience store division after the Directors allowed ARKO to undertake due diligence, and the Directors were concerned that this might happen again. Should that happen and the BP transaction fell through, the Directors said, the Company's stockholders would lose out on a "substantial premium." Finally, the Directors reasoned that they were unaware of ARKO having completed such a transaction before, and they refused to discuss transactions with ARKO any further.

The Company's April 24, 2023 press release summarized those reasons. The release noted as well that the Company had obtained a waiver from BP to permit the meeting with ARKO to take place. On April 25, 2023, ARKO responded that the Company limited the

meeting to a half hour within a specified time window. ARKO also highlighted that the Company limited ARKO to yes or no answers even if questions could not be answered fully by a yes or no response. ARKO stated that the Company brushed aside ARKO's attempts to explain its financing and disagreed again that its financing was conditional. As for the 2018 transaction, ARKO stated that it reduced its bid due to an evaluation ARKO had undertaken, and ARKO's conclusion was correct as the Company recorded over $100 million in impairment damages related to the Company's convenience store division. Lastly, ARKO stated that it considered the Company's April 24, 2023 letter as an assault on ARKO's commitment to consummate transactions, which was not reflected in ARKO's most recent transactions. Although ARKO remained interested in purchasing the Company, it felt that the Directors' refusal to engage with ARKO had run on too long to allow the Company to terminate its Merger Agreement with BP in a timely manner. Regardless, it filed the letter as part of its Securities Exchange Commission ("SEC") filings.

On May 1, 2023, the Company issued a press release stating that the Directors were recommending that the stockholders vote for the transaction. Ahead of the vote, the Directors informed the stockholders that any abstentions in the vote would be counted as votes against the proposal to approve the merger. On May 10, 2023, the stockholders voted to approve the transaction with BP.

## B.     Procedural Background

About two months later, SEPTA filed a complaint against the Directors for alleged breaches of the Directors' fiduciary duties in Montgomery County. On August 11, 2023,

SSF filed a complaint against the Company, BP, and the Directors for alleged breaches of fiduciary duties and aiding and abetting. After a transfer of venue in the SEPTA case to Baltimore City, the two cases were consolidated, and the consolidated litigation proceeded with SSF as the lead plaintiff.

On January 5, 2024, SSF filed a three-count Amended Complaint against the Directors, SVC, RMR, and BP (collectively, "DSRB"). In the first count, SSF alleged that the Directors breached their fiduciary duties by placing SVC's and RMR's interests ahead of the stockholders' interests. SSF alleged as well that the Directors failed in various ways in relation to the merger with BP: they failed to disclose all relevant information about the BP transaction to the stockholders; to maximize the Company's value; to inform themselves adequately about the value of the Company's shares before making material decisions leading up to the merger; and to negotiate with ARKO and permit ARKO to conduct due diligence; and they deprived the stockholders of their true value in the Company and their ability to make an informed decision about the Merger Agreement. In the second count, SSF alleged that the Directors breached their fiduciary duties by failing to conduct a market check that would have provided adequate information to the Directors about the BP transaction and by depriving the stockholders of their chance to capture their true value in the Company and make an informed decision about the merger.

The final count alleged aiding and abetting on the part of SVC, RMR, and BP. SSF alleged that but for SVC's and RMR's involvement, the alleged breaches of the Directors' fiduciary duties would not have occurred. As a result of their involvement, asserted SSF, the three defendants obtained or will obtain direct or indirect benefits: BP received a

22

discount in the transaction and SVC and RMR obtained their preferred buyer. Additionally, BP discussed and exchanged documents with the Company, SVC, and RMR leading up to the merger, which, as SSF asserted, provided the Directors' justification to reject ARKO. SSF alleged also that SVC used its consent right to sway the process to procure its favored buyer. SSF asserted that SVC, RMR, and BP engaged in backroom dealing to ensure that the Directors would not consider ARKO, despite knowing that the Company could negotiate with ARKO without jeopardizing the BP transaction. And lastly, given Messrs. Pertchik's and Portnoy's positions, SSF alleged their knowledge of all these actions should be imputed to SVC and RMR.

DSRB filed a motion to dismiss SSF's Amended Complaint for a failure to state a claim. DSRB argued that there was no duty to maximize stockholder value in Maryland. The law in Maryland, they said, was enumerated under a statute that SSF failed to cite, yet SSF had asserted a breach of those statutory duties. The Board also argued that SSF did not allege facts sufficient to overcome the presumption that the Board acted within its statutory duties. Moreover, they said, because the stockholders voted in favor of the transaction and were fully informed ahead of that vote, any breach of fiduciary duty claims were extinguished. Additionally, there was an exculpation clause in the Company's charter that barred explicitly any money damages claims against the Directors, and SSF hadn't pled any claims that fell outside that clause.

Lastly, DSRB asserted that SSF's aiding and abetting claims failed because SSF hadn't alleged that SVC, RMR, or BP knowingly provided substantial assistance to any alleged breaches, had failed to allege that SVC or RMR engaged in any conduct separate

23

from the Directors' acts, and had failed to allege that any of SVC's or RMR's acts amounted to encouragement or substantial assistance to the commission of any underlying tort. And regardless, DSRB stated, SVC's consent right was disclosed fully and any claim of aiding and abetting on SVC's and RMR's part was waived. As for BP, DSRB claimed that SSF failed to allege that BP engaged in any conduct that would support liability for aiding and abetting.

After an opposition from SSF and a reply from DSRB, the court held a hearing on the motion on April 22, 2024. The court heard argument from the Directors' counsel, followed by SVC's and RMR's counsel. BP's counsel followed. Then came SSF's attorneys, and after rebuttals and a surrebuttal, the hearing concluded. The court granted the DSRB's motion to dismiss SSF's amended complaint on May 8, 2024. SSF filed a timely notice of appeal. We supply additional facts as necessary below.

## II.    DISCUSSION

The parties present several questions[2] that we have recast as follows: (1) whether

[2] SSF frames their questions presented as:

A.    Did the Circuit Court err in dismissing Appellants' complaint for failure to state a claim?

B.    Did the Circuit Court err in defining and applying the standard required to overcome the business judgment presumption under Maryland law?

C.    Did the Circuit Court err in defining and applying the doctrine of stockholder ratification under Maryland law?

D.    Did the Circuit Court err in considering the exculpation clause in TravelCenters' charter upon deciding the motion to dismiss when it was not referenced in or attached to the complaint?

E.    Did the Circuit Court err in accepting as true Appellees' recitation of the facts rather than the factual allegations in the complaint—and all reasonable inferences that could be drawn in Appellants' favor—when deciding the motion to dismiss?

DSRB presents its questions as:

1.    Did the Circuit Court correctly conclude that Plaintiffs' allegations are insufficient to overcome Maryland's statutory presumption that directors acted in accordance with their duties?

2.    Did the Circuit Court correctly conclude that Plaintiffs' claims are foreclosed by the informed vote of a majority of TravelCenters' disinterested stockholders in favor of the BP transaction?

3.    Did the Circuit Court properly consider the exculpation clause in TravelCenters' charter in ruling on Defendants' motion to dismiss?

4.    Did the Circuit Court properly dismiss Plaintiffs' aiding-and-abetting claims because Plaintiffs failed to plead any breach of fiduciary duty?

SSF pled sufficient facts to overcome the presumption that the Directors acted within their business judgment in connection with the merger; (2) whether the circuit court considered the Company's exculpation clause properly; and (3) whether SSF pled sufficient facts to allege an aiding and abetting claim against SVC, RMR, and BP. We affirm the circuit court's dismissal of SSF's complaint.

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Md. Rule 2-322(b). "'We review the grant of a motion to dismiss as a question of law,'" *Oliveira v. Sugarman*, 451 Md. 208, 219 (2017) (*quoting Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 334 (2009)), "analyz[ing] whether the granting of the motion was legally correct." *Id.* (*quoting RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 643–44 (2010)). We undertake this review without deference to the circuit court. *Id.* "[W]e ask whether the facts alleged in the well-pleaded complaint, if taken as true, support a cause of action for which relief may be granted." *Id.* (*quoting RRC Ne., LLC*, 413 Md. at 644). And we "construe all inferences in the light most favorable to the non-moving party, and order dismissal only if the allegations and permissible inferences, if true, still fail to afford the plaintiff relief." *Id.* at 219–20. "Consideration of the universe of 'facts' pertinent to the court's analysis of the motion [is] limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any." *RRC Ne., LLC*, 413 Md. at 643.

A.    **SSF Failed To State A Claim For A Breach of A Fiduciary Duty Because Their Allegations, Taken As True, Do Not Defeat The Business Judgment Rule.**

SSF asserts that the circuit court analyzed its pleading against an insurmountable business-judgment-rule standard. Citing *Oliveira v. Sugarman*, 451 Md. 208 (2017), and

26

*Boland v. Boland*, 423 Md. 296 (2011), SSF claims that to overcome the standard, the claimant must allege that a board decision was not independent, not in good faith, or failed to fall within the realm of sound business judgment. And because of that, the circuit court's reliance on *Cherington Condominium v. Kenney*, 254 Md. App. 261 (2022), which discussed how to overcome the business judgment rule, was misplaced. DSRB counters that the circuit court applied the correct standard, that the *Kenney* standard is commonplace, and that SSF's allegations still wouldn't overcome the business judgment rule even under the standard SSF requests. DSRB has it right.

We start by analyzing SSF's complaint. In Maryland, a breach of a fiduciary duty requires three elements: (1) an existing fiduciary relationship; (2) that the fiduciary breached a duty it owed to a beneficiary; and (3) harm to the beneficiary. *Plank v. Cherneski*, 469 Md. 548, 599 (2020) (*citing Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). The remedy for these claims is "dependent upon the type of fiduciary relationship, and the remedies provided by law, whether *by statute*, common law, or contract." *Id.* (emphasis added).

The General Assembly has codified the duties of a corporate director in statute: "A director of a corporation shall act: (1) In good faith; (2) In a manner the director reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." Md. Code (1975, 2014 Repl. Vol., Supp. 2024), § 2-405.1(c) of the Corporations & Associations Article ("CA"). An "act of a director of a corporation relating to or affecting an acquisition or a potential acquisition of control of the corporation or any other transaction or potential

27

transaction involving the corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director." CA § 2-405.1(h). This is "*the sole source of duties of a director to the corporation or the stockholders of the corporation*, whether or not a decision has been made to enter into an acquisition or a potential acquisition of control of the corporation or enter into any other transaction involving the corporation." CA § 2-405.1(i) (emphasis added); *see Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 25 (2023). And although styled as breaches of fiduciary duties, SSF alleged here that the Directors breached one or more of the *statutory* duties. *See* CA § 2-405.1(c); *see generally* James J. Hanks Jr. Maryland Corporation Law § 6.06B 6-27–6-28 (2d ed. 2020 & Supp. 2024) (emphasizing that CA § 2-405.1(c) and Section 8.30(a) of the Model Business Corporation Act from which the former is derived omit "any reference to 'fiduciary' 'because that term could be confused with the unique attributes and obligations of a fiduciary imposed by the law of trusts, some of which are not appropriate for directors of a corporation'" (*quoting* Model Bus. Corp. Act § 8.30 Official Comment 1 (1984)); *Mekhaya*, 486 Md. at 50 (Booth, J., concurring) (noting there that although claimant titled their claim as "a 'breach of fiduciary duty' claim, in substance, [claimant was] alleging that [] directors violated their statutory standard of conduct that a director owes to a corporation and its stockholders.").

Although the business judgment rule was born out of common law, the General Assembly has codified it.[3] *Oliveira*, 451 Md. at 222; *Boland*, 423 Md. at 328 n.24. The

---

[3] "Unlike in Delaware, where the business judgment rule and the duties of directors have been developed solely by case law, in Maryland the business judgment rule has

Continued . . .

relevant section provides that a director acting "in accordance with the standard of conduct provided in this section shall have the immunity from liability" arising from the performance of those duties. CA § 2-405.1(e). Moreover, an "act of a director of a corporation is presumed to be in accordance with [CA § 2-405.1(c)]." The business judgment rule applies where a claimant seeks to challenge acts of a board of directors that fall within that board's business judgment. The claimant's main hurdle becomes pleading facts sufficient to overcome the business judgment rule. *See Oliveira*, 451 Md. at 246 (affirming dismissal of petitioner's claims because petitioner failed to overcome business judgment rule presumption); *see also Black v. Fox Hills N. Cmty. Ass'n, Inc.*, 90 Md. App. 75, 82–83 (1992) (although relying on common law business judgment rule, affirming dismissal of complaint where claimant's allegations were insufficient to overcome business judgment rule); *see also* James J. Hanks Jr., *Maryland Corporation Law* § 6.09 6-80 (2d ed. 2020 & Supp. 2024) ("Where a party challenging a decision by the board meets its burden and overcomes the presumption, the challenged action of the directors will be tested under the standard of conduct of Section 2-405.1(c).").

### 1. SSF's Complaint does not plead sufficient facts to overcome the business judgment rule.

As an initial matter, SSF disagrees with the circuit court's articulation of how to overcome the business judgment rule. We don't.

A party has two ways to overcome the business judgment rule. *Cherington*

---

been codified in Section 2-405.1 of the MGCL." James J. Hanks Jr., *Maryland Corporation Law* § 6.09 6-78 (2d ed. 2020 & Supp. 2024).

*Condominium v. Kenney*, 254 Md. App. 261, 279 (2022). *First*, a party "may make a showing of 'fraud or bad faith.'" *Id.* (*quoting Reiner v. Ehrlich*, 212 Md. App. 142, 155 (2013)); *see Boland*, 423 Md. at 329 ("A shareholder may 'show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment.'" (*quoting Bender v. Schwartz*, 172 Md. App. 648, 666 (2007)); *N.A.A.C.P. v. Golding*, 342 Md. 663, 673 (1996) ("The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith."). If a challenging party meets this burden, the business judgment rule does not apply. *Kenney*, 254 Md. App. at 279. *Second*, a party "may make a showing that a director has a conflict of interest relating to the board's decision—i.e., that the director, or someone close to that director, has a personal financial interest in the outcome of the board's decision." *Id.*; *see Boland*, 423 Md. at 329 ("'[D]irectors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'" (*quoting Werbowsky v. Collomb*, 362 Md. 581, 609 (2001))). If the party satisfies this standard, "then the burden shifts to the board to 'show that [the board's action] was just and proper, and that no advantage was taken of the stockholders.'" *Kenney*, 254 Md. App. at 279-80 (*quoting Francis v. Brigham-Hopkins Co.*, 108 Md. 233, 269 (1908)).

The circuit court here recognized, as this Court has, that the business judgment rule is codified in Maryland. The court identified the three duties that the statute imposes and recognized that "[a] director's actions are 'presumed to be in accordance' with [CA § 2-405.1(c)]." CA § 2-405.1(g). The circuit court stated that to overcome the business judgment rule, the claimant "must plead facts that demonstrate fraud, bad faith, unconscionable conduct, or a conflict of interest that triggers the interested director transaction rule." From there, the court quoted the language we used in *Kenney* to reason that SSF had not pleaded facts sufficient to meet the interested director standard.

The court articulated the standard correctly. Although it's true, as SSF asserts, that the business judgment presumption only shields directors who act in accordance with the statutory standard of care, *see* CA § 2-405.1(e), the statute also states that the directors' actions are "presumed to be in accordance with [CA § 2-405.1(c)]," just as the circuit court said. CA § 2-405.1(g). That is the business judgment presumption. *Kenney*, 254 Md. App. at 285. SSF also argues that the *Kenney* standard is not appropriate for two reasons. The *first* is that the *Kenney* case ascended the Maryland courts on an administrative law posture, so we were reviewing only whether the record contained substantial evidence to uphold the initial administrative decision. The *second* is that the facts in *Kenney* concerned a condominium association rather than the directors of a corporation.

Neither distinction changes the analysis. As to the *first* point, SSF misses half of the standard: although we review an agency's overall conclusions on appeal for substantial

evidence, and give them great deference, we review purely legal questions *de novo*. *Commissioner of Lab. and Indus. v. Whiting-Turner Contracting Co.*, 462 Md. 479, 490 (2019) ("[P]urely legal questions are reviewed *de novo* with considerable 'weight [afforded] to an agency's experience in interpretation of a statute that it administers[.]'" (*quoting Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005)); *Maryland Ins. Com'r v. Cent. Acceptance Corp.*, 424 Md. 1, 19 (2011) ("[J]udicial review of an agency action on a question of law engages a generally non-deferential standard of review."). And outside the administrative world, on a motion to dismiss posture, we employ a *de novo* standard. *Mekhaya*, 486 Md. at 20 (*citing Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 551 (2021)).

As for SSF's *second* distinction from *Kenney*, it's true that the complaint there originated in an administrative agency. *See* 254 Md. App. at 266–67. The condominium association in *Kenney* argued in this Court that the association's actions there—maintaining areas as identified in its governing documents—were entitled to business judgment protection. *Id.* at 275. That raised two questions: what is the business judgment rule, and does it apply to condominium associations? *Id.* at 278, 286. SSF seems to conflate these two and suggests that our recitation of the business judgment rule meant that the rule, as applied to condominium associations, differs from the version applied to corporations. It doesn't. Although we struggled in *Kenney* to find cases where the rule had applied to condominium associations, *id.* at 287 n.8., we concluded ultimately that it did apply to them. *Id.* at 287–92. As we noted there, *id.* at 287, 288, we had applied the rule before in different contexts, and specifically to homeowners' associations. *See Black*, 90 Md. App.

at 82–83 (applying business judgment rule to homeowners' association decision to approve fence); *see also Reiner*, 212 Md. App. at 153, 155–56 (applying business judgment rule to homeowners' association's decision denying request to install asphalt roof). So regardless of whether the claimant seeks to rebut the presumption favoring a condominium association or a corporation's board of directors, the standard remains the same. Nothing in *Kenney* recognized or applied a different business judgment rule for condominium associations than for corporations or suggested that overcoming that rule depends on whether the claimant is challenging the actions of a condominium association or a corporation.

b. SSF's allegations of fraud and bad faith are insufficient as pled to overcome the business judgment rule.

Against this legal backdrop, we turn to the complaint. SSF argues that the circuit court ignored SSF's well-pleaded allegations and instead adopted DSRB's version of the facts. DSRB responds that SSF's allegations were bald assertions and not well-pleaded. We examine the allegations here against the two ways challengers can overcome the business judgment rule. *See Kenney*, 254 Md. App. at 279–80. DSRB wins on both.

The first way to overcome the business judgment rule is to establish fraud or bad faith. *Id.* In *Eastland Food Corporation v. Mekhaya*, 486 Md. 1 (2023), the claimant alleged that the board permitted the majority stockholders to misappropriate corporate funds for personal use. The claimant also alleged that the board had compensated those stockholders excessively and to his detriment. *Id.* at 34. In contrast, here SSF alleged fraud or bad faith in the form of: (1) the Directors advancing SVC's and RMR's personal interests

ahead of the Company's interests; (2) the Directors not providing all material information related to the transaction to the stockholders, such as the Company's value; (3) the Directors failing to take the steps to maximize the Company's value; and (4) the Directors failing to inform themselves adequately about whether ARKO's proposal was a superior proposal or reasonably could lead to a proposal superior to BP's. We shall address these in turn.

As to the first allegation, SSF argues that the Directors delegated "the sale process to SVC entirely." But even in the light most favorable to SSF, on this record, this was insufficient to demonstrate fraud or bad faith. As SSF concedes here, in its complaint and at the motion to dismiss hearing, SVC had a contractual right to veto the Company assigning its leases. SVC informed the Directors that it would only consent to transfer the leases if satisfied with a potential buyer's creditworthiness. Although SSF saw this as "unnecessary and arbitrary," it nevertheless counted as a risk that the Company ran by contracting with SVC. This is not an allegation that the Board permitted SVC, as a stockholder and landlord, to misappropriate corporate funds or compensate SVC excessively. *Cf. Mekhaya*, 486 Md. at 34. More importantly, asserting that the Directors ceded their control to SVC in this context, in light of SVC's contractual right, without more, falls short of bad faith or fraud. SSF also fails to reconcile the Directors' perceived failure to approach SVC to "abandon its 'preliminary view' [rejecting ARKO] and instead consent to an ARKO purchase," with bad faith. What happened here was that the Directors recognized that SVC would have to approve the ultimate purchaser, and they proceeded with a bidder that the Directors concluded met SVC's criteria—BP. This decision was

entitled to the business judgment presumption.

SSF's allegations of inadequate disclosures don't help either. As we discuss more fully below, the Directors disclosed all material information to the stockholders. This included the Directors' conflicts of interest, SVC's and RMR's relationship with the Company, the Company's value, and the Directors' decision to reject ARKO's bid due to creditworthiness, an important factor for SVC. In turn, SSF, as stockholders, ran the risk that these conflicts would affect deals like this, as the Directors informed them.[4] So the fact that Mr. Pertchik and Mr. Portnoy were dual fiduciaries to the Company's stockholders, SVC, and RMR was unavailing because the Directors disclosed those relationships. And missing from these allegations is what more the Directors should have disclosed and why what was not disclosed was material.

The latter two allegations pertain to the Directors' decision to move forward with BP's offer over ARKO. BP's offer was an all-cash offer at $86 per share or $1.3 billion of equity value. The Directors submitted to the stockholders (and SSF does not argue otherwise) that this offer represented an 84% premium to the average trading price of the Company's stock, which, as of the same month of BP's bid, was trading at $46.68 per share. The next highest bid was $68 per share, again, a fact SSF does not dispute. Even viewing the allegations in the light most favorable to SSF, it can't refute that this offer

---

[4] Some of these disclosures were as explicit as can be: "[The Company's] creation was, and [its] continuing business will be, subject to conflicts of interest"; "These conflicts may have caused, and in the future may cause, adverse effects on our business"; "[S]ome persons may allege that these conflicts of interest and potential conflicts of interest may create a basis on which litigation is brought against [the Company]."

35

exceeded the Company's value. Although ARKO's offer was higher, $92 per share, directors of Maryland corporations are not required to act solely on the "amount or type of consideration that may be offered or paid to stockholders of the corporation in an acquisition or a potential acquisition of control of the corporation." CA § 2-405.1(f)(5)(ii).

Finally, SSF argues that it pleaded sufficiently that the Directors did not "survey the full assortment of otherwise suitable counterparties" and that the Directors' reasons for rejecting ARKO were pretextual. This claim lacks merit as well. In the complaint, SSF asserted that the Directors "had a duty to secure the best value reasonably attainable for the stockholders," and consistent with that, to "act in a fully informed manner, and in good faith, to obtain the best deal available." That's true as far as it goes. In change of control cases, "it is accepted practice for the board of directors to seek the best value and other terms reasonably available." James J. Hanks Jr., *Maryland Corporation Law* § 6.07C 6-63 (2d ed. 2020 & Supp. 2024).

Even so, a board of directors can reject the highest bid. CA § 2-405.1(f)(5)(ii). There need not be "an auction, or a heated bidding contest, and there is no obligation to engage in any 'market check' before entering into the transaction." James J. Hanks Jr., *Maryland Corporation Law* § 6.07E 6-68 (2d ed. 2020 & Supp. 2024); *see Wittman v. Crooke*, 120 Md. App. 369, 378 (1998) (recognizing that in stockholder ratification context, whether directors could have procured a better deal is not a cause of action). A board of directors also may formalize the process and can decide to include pre- and post-agreement market checks. James J. Hanks Jr., *Maryland Corporation Law* § 6.07C 6-63 (2d ed. 2020 & Supp. 2024). "A pre-agreement market check may involve a survey of possible buyers and the

36

advice and assistance of independent experts." Hanks, *supra*, at § 6.07E 6-68. Directors

are entitled to rely on these experts:

> (d)(1) A director is entitled to rely on any information, opinion,
> report, or statement, including any financial statement or other
> financial data, prepared or presented by:
>
> (i)     An officer or employee of the corporation whom the
> director reasonably believes to be reliable and
> competent in the matters presented;
>
> (ii)     A lawyer, certified public accountant, or other person,
> as to a matter which the director reasonably believes to
> be within the person's professional or expert
> competence.

CA § 2-405.1(d)(1). A post-agreement check should provide a reasonable opportunity for

other offers. James J. Hanks Jr., *Maryland Corporation Law* § 6.07E 6-68 (2d ed. 2020 &

Supp. 2024). Such an agreement may take the form of "explicit authorization for the board

to terminate the agreement upon receipt and acceptance of a superior proposal ('fiduciary

out')." Hanks, *supra*, at 6-68–6-69. But whatever process the board chooses is assessed

against the backdrop of the duties enumerated in CA § 2-405.1(c). So long as the board

reaches its conclusions in good faith, believing the transaction to be in the corporation's

best interests and after exercising ordinarily prudent care of similarly situated directors,

courts don't interfere with that decision-making. CA § 2-405.1(c); James J. Hanks Jr.,

*Maryland Corporation Law* § 6.07C 6-63 (2d ed. 2020 & Supp. 2024). The Board's

pre-agreement process in this case included hiring Citi as a financial advisor and R&G as

a legal advisor to contemplate the sale of the Company. Engagement with these two

advisors entailed several meetings with presentations to the Directors, Citi reaching out to

potential bidders and some of those bidders' financiers, and orchestrating the bidding and

diligence processes.

SSF alleged that the process excluded other potential buyers due to SVC's creditworthiness requirement, that the Directors did not guard against potential conflicts from Messrs. Pertchik and Portnoy, and that Citi's fairness opinion valued the Company within the range of $73.57 to $124.01 per share, which, according to SSF, indicated that the Company was valued "much higher than the $86 per share price to be paid by BP." But none of these claims alleges sufficiently that the Directors acted in bad faith. The first assertion is meritless in light of SVC's contractual right to veto lease assignments. The second ignores that all potential conflicts were disclosed. And as for the third assertion, Citi informed the Directors in that same opinion that BP's offer was "fair, from a financial point of view, to the holders of [the Company's] common stock." The Directors were entitled to rely on their retained expert. C&A § 2-405.1(d)(ii).

Post-agreement, the Directors employed the "fiduciary out." The Company included in its Merger Agreement with BP a provision for the Directors, upon receiving an unsolicited offer and with counsel from its legal and financial advisors, to determine in good faith whether the offer was superior to BP's or could reasonably lead to one:

> [A]t any time following the date hereof and prior to obtaining the Company Stockholder Approval, if the Company . . . has received a written, *bona fide*, unsolicited Acquisition Proposal from any Third Party (or a Group of Third Parties) that the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel, constitutes or could reasonably be expected to lead to a Superior Proposal, and the failure to take the following actions would reasonably be expected to be inconsistent with its duties under Applicable Law, then the Company, directly or indirectly through the Acquisition Representatives of the

38

> Company may (i) engage in negotiations or discussions with such Third Party and its Acquisition Representatives and (ii) furnish to such Third Party or its Acquisition Representatives non-public information relating to the Company or any of its Subsidiaries pursuant to an Acceptable Confidentiality Agreement[.]

SSF takes issue with the Directors' decision to reject ARKO's offer. It alleges that refusing to entertain the offer "rejected the post-signing possibility of a market check." But the Directors did have both a pre- and post-agreement check and having both indicated that the Directors acted in good faith. The Directors were not required to pursue every post-agreement offer they received, only those they determined to be superior to BP's offer or that could reasonably lead to an offer superior to BP's offer. And although the Directors initially declined to meet with ARKO out of concern that ARKO's offer relied on several contingencies, the Directors did engage and meet with ARKO and its legal and financial advisors. Upon meeting with ARKO, the Directors reiterated that they did not believe ARKO's offer was superior to or reasonably could lead to an offer superior to BP's. This decision was entitled to the business judgment presumption.

SSF's bald assertions that the Directors' reasons for rejecting ARKO were "pretextual" can't overcome the presumption either. Although a court, on a motion to dismiss standard, treats all well-pleaded facts as true, the condition there is that the facts must be well-pleaded in the first place. The Directors provided six separate reasons for rejecting ARKO's offer. The first set of reasons homed in on ARKO's financing. ARKO's offer amounted to $2.4 billion, but $1.25 billion of that relied on selling the Company's properties. As the Directors pointed out, ARKO would not own those properties until

39

closing, and in any case, ARKO had overvalued the properties, so the Directors concluded that the $1.25 billion was, at best, a remote possibility. In addition, ARKO planned to obtain $663 million of the $2.4 billion from a Capital One line of credit based on an expanded asset-based lending facility. And yet ARKO had provided the Directors no evidence that such funds were available, nor had it revealed any conditions on obtaining those funds. ARKO acknowledged that the facilities had not yet been expanded to meet the capacity ARKO stated in its offer. Finally, ARKO planned to use the Company's funds for the remaining $416 million to reach the $2.4 billion offer. Again, ARKO would not have access to those funds until closing and, as the Directors noted, those funds were necessary for operating the Company.

The Directors also were concerned about other contingencies in ARKO's offer. One of these was ARKO's credit insurance provider. That provider was supposed to address the Directors' concerns about ARKO's subpar credit rating, but the Directors discovered that ARKO's discussions with the insurance provider were preliminary and that ARKO did not know the cost of obtaining the policy or the details of the policy it sought. ARKO also refrained from identifying the provider or allowing the Directors to speak with them. The Directors stated also that ARKO needed to obtain governmental and regulatory authorizations to complete the transaction. Waiting for ARKO to do so, the Directors reasoned, would have led to further delay and uncertainty. And so despite ARKO's assurances to the Directors, the Directors concluded after meeting with ARKO that their concerns were largely unaddressed. SSF's complaint does not assert why either of these reasons, on their own and in light of the meeting, was "pretextual."

What the complaint does is focus on the last reason, execution risk. SSF alleges that the execution risk concern was really a "grudge" based on a failed transaction between ARKO and the Company back in 2018. During that transaction, ARKO bid on and attempted to purchase the Company's convenience store division. After conducting diligence, ARKO lowered its bid substantially. The Directors were concerned that ARKO would do the same with this transaction and that the stockholders would lose out on the 84% premium afforded by BP's offer. Furthermore, the only other bid on the table was $68 per share, a reduced premium compared to BP's $86 per share offer. Although characterized as a grudge, SSF needed to allege why this line of reasoning fell outside the realm of sound business judgment. The Directors, like some research analysts, also were concerned that ARKO had never completed a transaction of that magnitude and that ARKO might struggle with this transaction. Given the pre- and post-agreement checks and the reliance on their advisors, we cannot say that the Directors' process was executed in bad faith and fell outside the realm of sound business judgment.

c. <u>SSF's allegations as to the Directors' conflicts of interest are insufficient on this record to overcome the business judgment rule.</u>

Although SSF argues otherwise, we held in Section A.1.a that the circuit court articulated the correct standard for overcoming the business judgment rule. As we discussed, the second way to overcome the business judgment rule is by demonstrating that a given director has a conflict of interest relating to the board of directors' decision. *Kenney*, 254 Md. App. at 279–80. Once a party establishes that a conflict exists, it falls to those directors to prove that their actions were "'just and proper, and that no advantage was

taken of the stockholders.'" *Id.* (*quoting Francis*, 108 Md. at 269). One way a board

achieves this is through stockholder ratification. *Id.* Just as with the business judgment rule,

Maryland codified the interested director rule:

> (a) If subsection (b) of this section is complied with, a contract or other transaction between a corporation and any of its directors or between a corporation and any other corporation, firm, or other entity in which any of its directors is a director or has a material financial interest is not void or voidable solely because of any one or more of the following:
>
> > (1) The common directorship or interest;
> >
> > (2) The presence of the director at the meeting of the board or a committee of the board which authorizes, approves, or ratifies the contract or transaction; or
> >
> > (3) The counting of the vote of the director for the authorization, approval, or ratification of the contract or transaction.
>
> (b) Subsection (a) of this section applies if:
>
> > (1) The fact of the common directorship or interest is disclosed or known to:
> >
> > > (i) The board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum; or
> > >
> > > (ii) The stockholders entitled to vote, and the contract or transaction is authorized, approved, or ratified by a majority of the votes cast by the stockholders entitled to vote other than the votes of shares owned of record or beneficially by the interested director or corporation, firm, or other entity; or
> >
> > (2) The contract or transaction is fair and reasonable to the corporation.
>
> * * *
>
> (d)(1) If a contract or transaction is not authorized, approved, or ratified in one of the ways provided for in subsection (b)(1) of this section, the person asserting the validity of the contract

> or transaction bears the burden of proving that the contract or transaction was fair and reasonable to the corporation at the time it was authorized, approved, or ratified.

CA § 2-419.

In relation to the business judgment presumption, "the interested director transaction rule operates as a brake on that presumption when conflicted director transactions are present." *Kenney*, 254 Md. App. at 285. It requires interested directors to disclose their conflicts or to demonstrate that the transactions implicated by those conflicts are fair and reasonable to the corporation. *Id.* Said differently, "if the board or the stockholders are properly informed of the conflict of interest, then the contract or transaction may be authorized, approved, or ratified by a majority of the disinterested board members or stockholders." *Kenney*, 254 Md. App. at 283; *Sullivan v. Easco Corp.*, 656 F. Supp. 531, 535 (D. Md. 1987) ("The burden of proving the fairness and reasonableness . . . is on the interested director only where disinterested director approval (or stockholder ratification) is lacking."). This has the same effect as a proving that the "'transaction is fair and reasonable to the corporation.'" *Kenney*, 254 Md. App. at 283 (*quoting* CA § 2-419(b)). The test for materiality is whether there's "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

SSF argues that the stockholders were not informed fully because the proxy statement "omitted a number of material facts." These included whether Messrs. Pertchik and Portnoy engaged in the merger negotiations as Company representatives or

representatives of SVC and RMR. But the Directors disclosed all potential conflicts of interest. The proxy statement stated explicitly that the Company's stockholders "should be aware that [the Company's] directors and executive officers may have interests in the merger that may be deemed to be different from, or in addition to, your interests as a stockholder." The Directors informed the stockholders that they were aware of the directors' relationships and considered them when "evaluating and overseeing the negotiation of the merger agreement, in approving the merger agreement and the merger and in recommending that the merger be approved by [the] stockholders." The Directors disclosed to the stockholders the Company's various relationships with SVC and RMR, as well as the Directors with conflicts stemming from those relationships. The Directors also advised the stockholders to read the entire proxy statement before voting and where to find more information related to the transaction and the Company generally. On this record, we see no error in the circuit court's conclusion that these conflicts were disclosed properly.

SSF argues also that the Directors failed to disclose ARKO's final letter to the stockholders, which explained and distinguished ARKO's 2018 decision not to move forward with the convenience store transaction. At the motion to dismiss hearing, SSF acknowledged that ARKO had disclosed this letter in its SEC filing but claimed that such disclosure was irrelevant because the Directors were obligated to disclose it. When asked what was so important about that letter, SSF responded that the letter was key in distinguishing that the 2018 transaction was for only the convenience store division, whereas the current transaction was for the entire Company. We disagree that this was material. As detailed in the Directors' last-disclosed letter to ARKO, the next best price

that the Company received was $68 per share. That was the only credible bidder left once the Directors had learned that ARKO had not addressed the Board's initial concerns. The Company's execution risk concerns arose not only from the 2018 transaction, but from this one as well. The Company believed, based on experience with ARKO, that it faced a risk that ARKO would reduce its bid after conducting due diligence and the Company's stockholders would lose out on BP's $86 per share premium. We disagree that informing the stockholders that the 2018 transaction covered a division within the Company rather than the whole Company would have "significantly altered the 'total mix' of information made available." *TSC Indus., Inc.*, 426 U.S. at 449.

SSF argues now that it "cannot be" the law in Maryland that a conflicted director could allow their underlying conflict to cause that director to act against the best interests of the stockholders and remain immune because the conflict was disclosed. And SSF is right. That is not the current law in Maryland. But SSF glosses over the principle that once the stockholders are informed fully about the material facts concerning a proposed transaction, stockholder ratification extinguishes any such breach of fiduciary claim. *Wittman*, 120 Md. App. at 377.

Ratification in Maryland arises under statutory law and common law. *See* CA § 2-419(a)–(b) (permitting stockholder ratification in cases involving a conflict of interest); *see also* CA § 2-702(a)–(b) (enumerating how directors or stockholders ratify a purportedly defective corporate act); *see also* CA § 2-707(a) ("Nothing in this subtitle may be construed to require that ratification of a defective corporate act under this subtitle be the exclusive means of ratifying or validating a defective corporate act . . . ."); *see also Wittman*, 120

45

Md. App. at 377 ("Maryland has long recognized the proposition that a board of directors is not 'liable to the stockholders for acts ratified by them.'" (*quoting Coffman v. Md. Publishing Co.*, 167 Md. 275, 289 (1934))). In *Sullivan v. Easco Corp.*, 656 F. Supp. 531, 535 (D. Md. 1987), the court granted summary judgment in part because the disinterested directors approved, unanimously, a contract involving a director with a conflict of interest. Likewise, the Supreme Court of Maryland in *Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 408 Md. 700, 721 (2009), relying on CA § 2-419, rejected the appellant's argument that the board of directors acted arbitrarily by permitting a conflicted director to chair a nominating committee for an election of trustees, because the majority of the disinterested directors ultimately approved the decision. And in *Wittman v. Crooke*, 120 Md. App. 369, 377 (1998), we rejected the appellant's contention that stockholder ratification could not cure an alleged breach of a fiduciary duty by directors, where there was full disclosure to the stockholders, who then ratified the transaction.

The stockholder ratification here extinguished any claim for a breach of the duties enumerated in CA § 2-405.1(c). SSF does not dispute that a majority of the disinterested stockholders voted in favor of the Company's merger with BP. As the circuit court noted, about 93% of all stockholders voted for the merger. SSF responds that although the stockholders voted to approve the merger, they didn't vote to deny ARKO's bid or ratify the decision to reject that bid. SSF borrows language from the "fiduciary out" provision to assert that the stockholders didn't approve the Directors' decision that ARKO's bid did not constitute and couldn't reasonably be expected to constitute a superior proposal. Essentially, SSF argues that not allowing the stockholders to approve the Directors'

decision to reject ARKO specifically was a "defective corporate act." CA § 2-701(c).

But this is just wrong. SSF doesn't cite (and we didn't find) any authority (legal or in the Company's bylaws) for the proposition that a board of directors must provide stockholders with competing bids and allow the stockholders to vote for one. Similarly, SSF offers no authority for the proposition that a board first must obtain approval from the stockholders before rejecting a bid. That theory overlooks the business judgment rule, under which a reviewing court presumes the board of directors acted in good faith and in the best interests of the corporation. *Wittman*, 120 Md. App. at 376. And even if SSF's argument were the rule, which it isn't, its claim would fail anyway in light of the Board's ultimate ratification of the merger. Again, if the disinterested directors on a board are aware of the conflicted directors' involvement in a given transaction, a vote by the disinterested directors in favor of that transaction will ultimately be upheld. *See Tackney*, 408 Md. at 721; C&A § 2-419(b)(1)(i). Here, SSF does not dispute that the entire board of Directors was aware of Messrs. Pertchik's and Portnoy's potential conflicts and the Company's relationships with SVC and RMR. And yet the Directors were unanimous in their conclusion that ARKO's offer was not a superior proposal and could not be reasonably expected to lead to one, and of most importance, approved the BP merger unanimously. Even more, upon full disclosure to the stockholders, they voted to approve the merger. We agree with the circuit court that SSF failed to state a claim. *Wittman*, 120 Md. App. at 377.

**B.      The Circuit Court Considered The Exculpation Clause Properly.**

SSF argues *next* that circuit court erred by considering the exculpation clause in the Company's charter as part of its decision to dismiss SSF's complaint. It asserts that because the exculpation clause was not alleged in SSF's complaint, but rather was raised in DSRB's memorandum in support of its motion to dismiss, the court shouldn't have considered it. The Board responds *first* that SSF's argument wasn't preserved, and *second* that the exculpation clause was part of a required SEC filing of which we can take judicial notice. And because SSF's complaint repeatedly mentioned the Company's proxy, which contained the exculpation clause, the Board argues that the court did not err by relying on that clause as a reason to dismiss SSF's complaint.

The parties don't dispute the existence of this exculpation clause or its implication for the underlying claims, should it apply. SSF contends solely that the court shouldn't have considered it in denying SSF's motion to dismiss. DSRB asserts that SSF offered "only a single sentence related to the motion-to-dismiss standard" in its opposition to the motion to dismiss, claiming that "'certain courts have embraced the idea that in Maryland, exculpation is an affirmative defense that should not be invoked to warrant dismissal on the face of the complaint.'" But as SSF highlights, the circuit court addressed explicitly whether an exculpation clause can be considered at the motion to dismiss stage, ruled that it can, and cited case law to support its conclusion.

Under Maryland Rule 8-131(a), we generally "will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Because the circuit court addressed this issue, though, we will address it too. *See O'Leary v. Shipley*,

313 Md. 189, 196 (1988) (considering new First Amendment theory not raised in circuit court or in operative complaint because trial court decided case on First Amendment, albeit on a theory different from that raised on appeal).

The question then is whether the court should have considered the exculpation clause. A circuit court considering a motion to dismiss generally cannot examine materials outside the operative complaint, else the court risks turning that motion into a motion for summary judgment:

> If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2-501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2-501.

Md. Rule 2-322(c). But the court can't, and shouldn't, turn a blind eye to relevant facts not subject to reasonable dispute simply because those facts are not within the four corners of the operative complaint. Md. Rule 5-201. We have recognized an "exception to the general rule… where 'a document . . . merely supplements the allegations of the complaint, and the document is not controverted, consideration of the document does not convert the motion into one for summary judgment.'" *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 74 n.13 (2015) (*quoting Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 176 (2015)) (circuit court considered a Form S-4 filed with the Securities and Exchange Commission properly at the motion to dismiss stage); *see also Securities & Exch. Comm'n v. Prakash*, 718 F. Supp. 3d 1098, 1105 (N.D. Cal. 2024) (taking judicial notice of documents "incorporated by reference in the [c]omplaint and are otherwise judicially

noticeable as SEC filings, which are matters of public record not subject to reasonable dispute" at motion to dismiss posture); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) ("Judicial notice is appropriate of the content of S.E.C. filings, to the extent that this establishes that the statements therein were made, and the fact that these documents were filed with the agency.").

The exception applies here as well. In the Company's Annual Report filed with the S.E.C. on February 25, 2020, the filing included the exculpation clause. That clause limited the Directors' liability to stockholders to the fullest extent under Maryland law, accounting for the exceptions within Maryland's law on exculpation clauses in a corporation's charter:

> Our governing documents limit the liability of our Directors and officers to us and our stockholders for money damages to the maximum extent permitted under Maryland law. Under current Maryland law, our Directors and officers will not have any liability to us and our stockholders for money damages other than liability resulting from (i) actual receipt of an improper benefit or profit in money, property or services; or (ii) active and deliberate dishonesty by the director or officer that was established by a final judgment as being material to the cause of action adjudicated.

This clause also appears in the Company's February 26, 2021, Annual Report and the February 23, 2022, Annual Report. These documents were filed with the SEC. The circuit court did not err in considering the exculpation clause, which was found in publicly available documents, at the motion to dismiss stage.

SSF disagrees, citing *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005), *Zucker, Tr. of Anita G. Zucker Tr. Dated Apr. 4, 2007 v. Bowl Am., Inc.*, No. CV SAG-21-1967,

2022 WL 7050991 (D. Md. Oct. 11, 2022), and *Malpiede v. Townson*, 780 A.2d 1075, 1092 (Del. 2001), to argue that considering an exculpatory provision at the motion to dismiss stage is "contrary to the weight of legal authority," because exculpation is an affirmative defense. In *In re Tower Air, Inc.*, the court rejected the exculpatory provision argument because the directors there had raised it for the first time on appeal and because that provision's protection appeared "to be in the nature of an affirmative defense," which, under Third Circuit precedent, was not appropriate at the motion to dismiss stage. 416 F.3d at 242. In *Zucker*, the court rejected the exculpation argument because it found the provision to be an affirmative defense, meaning that it required the facts supporting that defense to appear on the face of the operative complaint. 2022 WL 7050991 at *4. Specifically, the exculpatory provision was not referenced in the operative complaint, and the charter that had the provision was not attached to the operative complaint. *Id.* And in *Malpiede*, the court there held that an exculpatory provision raised for the first time in a party's motion to dismiss memorandum is a matter outside the pleading that converts the motion to dismiss into a motion for summary judgment. *Malpiede*, 780 A.2d at 1092.

We are not persuaded. *First*, preservation is no hurdle in this case. DSRB raised this provision as protective of the Directors in its motion to dismiss, as SSF recognizes, and at the motion to dismiss hearing. *Second*, it's not inappropriate to consider the exculpatory provision at the motion to dismiss stage. In *Grill v. Hoblitzell*, 771 F. Supp. 709 (D. Md. 1991), the court dismissed the stockholders' derivative complaint in part because the allegations set forth in that pleading didn't allege active and deliberate dishonesty or the receipt of an improper benefit. *Id.* at 712. Under Maryland law, these are the only two

51

categories under which a party can recover money damages against a board of directors where an exculpatory provision would otherwise protect those directors. *Tomran, Inc. v. Passano*, 391 Md. 1, 6 n.4 (2006). The same is true here.

*Third*, Maryland's statute allowing for these exculpatory provisions differs from Delaware's counterpart. *CDX Liquidating Tr. v. Venrock Assocs.*, 640 F.3d 209, 215–16 (7th Cir. 2011) ("Delaware provides that articles of incorporation 'shall not eliminate or limit the liability of a director . . . for any breach of the director's duty of loyalty to the corporation or its stockholders, while Maryland law allows a corporation to shield its directors from all liability other than for 'active and deliberate dishonesty'" or receipt of an improper benefit. (citations omitted)); *Compare* Del. Code Ann. tit. 8, § 102(b)(7) (West) ("[T]he certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director or officer . . . provided that such provision shall not eliminate or limit the liability of: (i) A director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders; (ii) A director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) A director under § 174 of this title; (iv) A director or officer for any transaction from which the director or officer derived an improper personal benefit; or (v) An officer in any action by or in the right of the corporation."), *with* Md. Code (1973, 2020 Repl. Vol.), § 5-418(a) of the Courts & Judicial Proceedings Article ("CJP") ("The charter . . . of a Maryland corporation may include any provision expanding or limiting the liability of its directors and officers . . . but may not include any provision that restricts or limits the liability of its directors or officers to the corporation or its

52

stockholders: (1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services for the amount of the benefit or profit in money, property, or services actually received; (2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding; or (3) With respect to any action described in subsection (b) of this section.").

Maryland's two exceptions to liability are narrower and more focused, whereas Delaware provides six separate exceptions. James J. Hanks Jr., *Maryland Corporation Law* 6-85–6-86 (2d ed. 2020 & Supp. 2024) (commenting further on these differences and how Maryland's General Assembly rejected substituting Maryland's exceptions with Delaware's exceptions).

Moreover, as DSRB highlights, SSF's complaint incorporated the Company's proxy statement by reference. It did so through repeated references to that proxy statement. The complaint even asserted what SSF titled as "The Proxy Statements and Supplements Contain Material Misstatements and Omissions." And, of course, SSF asserted that the Directors breached their fiduciary duties in part by failing to provide all the material information about the merger in the proxy statement provided to the stockholders. The proxy statement, in turn, incorporated the Company's filings with the SEC. For example, the proxy statement incorporated by reference the Annual Report filed with the SEC on February 23, 2022, which contained the exculpatory provision. SSF stressed these filings, especially the proxy statement, in its complaint, and thus relied on them itself. That

53

stretched the four corners of the complaint to include the exculpatory clause. *ATSI Commc'ns, Inc.*, 493 F.3d at 98 (court considering a motion to dismiss may consider "documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 710 n.4 (2015) (where plaintiffs referred repeatedly to deposit account agreement in their complaint but did not attach it to the complaint, the court could refer to the agreement without transforming defendant's motion to dismiss into a motion for summary judgment).

## C. Because The Breach Of Fiduciary Duty Claims Fail, We Conclude That SSF's Aiding And Abetting Claims Fail Also.

*Finally*, SSF argues that we should reverse the dismissal of SSF's aiding and abetting claims. DSRB argues that SSF did not allege any acts on SVC's, RMR's, or BP's part that aided or abetted any breaches of the Directors' duties. And, DSRB contends, if the breach of fiduciary duty claims are extinguished, so too are the aiding and abetting claims. SSF doesn't dispute this last point, and we agree as well.

One of the requirements for an aiding and abetting claim is that there be a "'a direct perpetrator of the tort.'" *Sutton*, 226 Md. App. at 91 (*quoting Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 200–01 (1995)). There must, then, "'exist [some] underlying tortious activity in order for the alleged aider and abettor to be held liable.'" *Id.* In *Sutton*, after we had determined that the complaint failed to allege a viable claim for a breach of fiduciary duty, we affirmed the dismissal of the aiding and abetting

54

claims. *Id.* So too here. SSF failed to allege cognizable claims for a breach of the enumerated duties under CA § 2-405.1(c), *see* Section II.A above, so the aiding and abetting claims meet the same fate.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY COSTS.**